UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROMEL SAWERESS,

     Plaintiff,

v.                                                              Case No. 6:17-cv-1506-Orl-37TBS

WAYNE IVEY,

     Defendant.
_____

## ORDER

     This employment discrimination action brought by Plaintiff Romel Saweress against Defendant Wayne Ivey in his official capacity as Brevard County Sheriff concerns Defendant's purported failure to hire Plaintiff as a deputy sheriff for the Brevard County Sheriff's Office ("**Sheriff's Office**") due to his race, national origin, or both. (*See* Doc. 1.) Both parties moved for summary judgment (Doc. 19 ("**Defendant's Motion**"); Doc. 22 ("**Plaintiff's Motion**")), and each side responded and replied (Docs. 27–29). For the reasons set forth below, both motions are due to be denied.

## I.     BACKGROUND

     The dispute in this case stems from Defendant's decision to discontinue Plaintiff along the hiring process for a deputy sheriff position following an interview before the Oral Review Board ("**ORB**"). (Doc. 1.) Boiled down, the question now is why? Plaintiff claims that the real reason for the decision is that he is an Egyptian-American; Defendant counters with Plaintiff's poor interview performance and communication skills.

(*See* Docs. 1, 19, 22.) To uncover the truth behind Defendant's reason for choosing not to hire Plaintiff, the Court must first examine Defendant's hiring practices and the requirements for deputy sheriffs generally before turning to the details of Plaintiff's application materials, his ORB interview performance, and—most importantly—the comments made about Plaintiff during and after the ORB interview that resulted in Plaintiff being discontinued as a viable candidate for a deputy sheriff position.[1]

## A.    Defendant's Hiring Practices

The Sheriff's Office is a law enforcement agency under the command of Defendant that provides law enforcement services and operates a correctional facility in Brevard County, Florida. (Doc. 19-1, ¶ 4.) Accredited by the Commission of Law Enforcement Accreditation, the Sheriff's Office has been certified as having met specific requirements, including implementing and administering standards for the selection of sworn personnel that are uniformly applied and nondiscriminatory.[2] (*Id.* ¶ 5.)

---

[1] For the purpose of resolving a summary judgment motion, the Court ordinarily presents the facts in the light most favorable to the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). Here, however, both parties move for summary judgment, and the material underlying facts are not in dispute—it is only the inferences drawn from those facts that are in dispute. Therefore, in the following Section the Court presents the undisputed facts from the record evidence.

[2] In support of the nondiscriminatory nature of the Sheriff's Office's hiring practices, Defendant notes:

> The Sheriff's Office hired at least two other applicants of Middle Eastern [descent] around the time that Plaintiff was discontinued – Aziz Ghawi in July 2012 and Yousef Hafza in July 2015. (Ex. 1). Additionally, the Sheriff's Office employed at least six (6) other employees of Middle Eastern descent in 2014 [including] . . . an animal enforcement officer from Egypt.

(Doc. 19, p. 10 (citing Doc. 19-1).)

The Sheriff's Office's entry-level position for sworn law enforcement officers is deputy sheriff. (*See* Doc. 19-2.) Deputy sheriffs "[p]erform[ ] general law enforcement work . . . in the preservation and protection of life and property, the prevention of crime, the maintenance of good public order, the enforcement of civil and criminal law." (*Id.* at 1.) In carrying out these responsibilities, deputy sheriffs must prepare clear, concise reports or affidavits, testify in prosecutions, and keep records of all activities in accordance with established agency policy. (*Id.*) Additionally, deputy sheriffs must have, *inter alia*, the following skills: (1) "[a]bility to understand and carry out oral and written instructions"; (2) "[a]bility to communicate effectively; in both writing and orally; in both routine and emergency situations"; (3) "[a]bility to work closely with others as a team"; and (5) "[a]bility to prepare and present clear, accurate, concise and objective written and oral reports." (*Id.* at 2.)

The Sheriff's Office has a written policy and procedure for hiring deputy sheriffs, and it accepts applications on a continuous basis. (*See* Doc. 19-3; Doc. 19-4, pp. 5:20–6:10; Doc. 19-5, pp. 5:21–25; Doc. 19-6, p. 22:8–10.) Once an application is received, it is thoroughly screened to determine whether the candidate meets all the requirements for that position. (Doc. 19-3, p. 2; Doc. 19-4, pp. 12:17–13:3.) If so, the candidate must complete an additional background questionnaire. (Doc. 19-5, pp. 15:2–9.) If this questionnaire contains no automatic disqualifiers, the candidate proceeds to an ORB interview.[3] (Doc. 19-5, p. 16:2–5; Doc. 19-14, p. 7:6–13; *see also* Doc. 19-3, p. 3.)

---

[3] During the relevant time period, each ORB consisted of three members who primarily held the title of Major. (Doc. 19-6, p. 6:18–20; Doc. 19-8, p. 8:14–15.)

Upon arrival to the ORB interview but before entering the interview room, each candidate must prepare a written autobiography under time constraints, which the ORB considers along with the application and background questionnaire. (Doc. 19-6, pp. 8:25–9:7, 32:15–33:4; Doc. 19-8, p. 26:1–9; *see also* Doc. 19-7.) Then, during the ORB interview, the ORB members ask a set of pre-determined questions based on whether the candidate has prior law enforcement experience or not, and the ORB does not deviate from those questions unless a candidate raises a specific issue that requires follow-up questioning. (Doc. 19-6, pp. 6:24–8:17; Doc. 19-8, pp. 7:25–9:3; Doc. 19-14, pp. 10:3–13:8, 23:18–24:4.)

Throughout the interview, each ORB member fills out a Confidential Interview Report ("**CIR**"): a form used to assist ORB members in evaluating each candidate based on multiple categories. (Doc. 19-6, p. 11:10–15; Doc. 19-8, pp. 9:14–10:15; *see also, e.g.*, Docs. 19-9, 19-15, 19-16.) The form also contains space for additional comments and reasons for the final recommendation. (*See, e.g.*, Doc. 19-9, p. 2.) In deciding whether to pass a candidate, no single category is dispositive—ORB members look at the totality of the interview. (Doc. 19-6, pp. 12:4–7, 13:7–14:11; Doc. 19-8, pp. 11:20–12:1, 13:2–10.) Once the interview ends, the ORB members discuss the candidate, complete their CIRs, and try to reach a consensus (although one is not required) as to whether the candidate should continue to the next step of the hiring selection process. (Doc. 19-6, pp. 10:1–13, 41:8–16; Doc. 19-14, pp. 21:16–22:4.)

Candidates who pass the ORB interview must then complete a comprehensive background investigation, drug test, polygraph examination, psychological examination, and medical examination. (Doc. 19-3, p. 4; Doc. 19-4, pp. 6:22–7:10; Doc. 19-5, pp. 6:24–

7:8, 10:5–15; Doc. 19-6, p. 14; Doc. 19-14, p. 7:14–25.) Roughly fifty percent of candidates are discontinued at some point during these additional investigations and examinations. (Doc. 19-5, pp. 11:9–13:1.) From there, the remaining candidates are presented to the Sheriff or Chief Deputy for final discretionary approval. (Doc. 19-4, p. 9:16–19; Doc. 19-5, pp. 1:7–8, 13:2–8; Doc. 19-14, p. 22:5–18.) The approved candidates are given a hire date and must complete the field training program. (Doc. 19-5, pp. 13:2–14:1; Doc. 19-6, pp. 39:3–16; Doc. 19-18, p. 8:2–17.)

**B.      Plaintiff's Application and ORB Interview**

On or about May 1, 2014, Plaintiff applied for a deputy sheriff position with the Sheriff's Office. (Doc. 19-12, p. 4–5; Doc. 19-10, p. 70:9–14; Pl. Depo. Ex. 5.)[4] After it was determined that Plaintiff met the minimum requirements for the position, he completed a background questionnaire. (Pl. Depo. Ex. 6; Doc. 19-5, pp. 15:10–16, 16:2–5; Doc. 19-10, pp. 72:5–17, 88:5–10.) This questionnaire included a question regarding Plaintiff's place of birth, which he listed as Alexandria, Egypt. (Pl. Depo. Ex. 6, p. 1; *see also* Doc. 19-10, p. 94:1–7.) Finding no disqualifiers, Plaintiff was scheduled for an ORB interview. (Doc. 19-12, pp. 2–3; Doc. 19-5, p. 16:2–5.)

Plaintiff's ORB interview took place on July 25, 2014. (Doc. 19-12, p. 2.) Prior to

---

[4] Included with Plaintiff's deposition (Doc. 19-10) are various exhibits to the deposition. Throughout this Order, the Court has provided citations to the page numbers associated with the transcript rather than to the page number associated with the document number at the top of each page. Because Plaintiff's deposition transcript contains four pages of transcript per document page, the Court designates the following as citations to the relevant deposition exhibits to avoid confusion: **Pl. Depo. Ex. 5** (Doc. 19-10, pp. 48–53) and **Pl. Depo. Ex. 6** (Doc. 19-10, pp. 54–45; Doc. 19-11, pp. 1-11).

entering the interview room, Plaintiff completed the writing sample, in which he was required to highlight his educational and professional experiences as well as his reasons for pursuing a career in law enforcement. (Doc. 19-7; *see also* Doc. 19-6, pp. 32:17–33:9; Doc. 19-8, p. 26:1–9; Doc. 19-10, pp. 89:9–90:19.) He was then interviewed by Major Bruce Barnett ("**Major Barnett**"), Major Victor DeSantis ("**Major DeSantis**"), and Major Paul Ring ("**Major Ring**"). (Doc. 19-6, p. 9:8–11.) Each of these ORB members had significant experience working at the Sheriff's Office, and at the time of Plaintiff's interview, Major Barnett was in charge of the field training evaluation program. (Doc. 19-6, pp. 5:8–15, 9:12–18; Doc. 19-8, pp. 5:17–6:6; Doc. 19-14, pp. 5:17–6:10.)

The interview started with one ORB member asking Plaintiff to tell them a little about himself. (Doc. 19-10, p. 91:16–18.) As Plaintiff recalled it, during his answer someone asked him where he learned English, to which he replied, "Why? You don't like the way I speak?" (*Id.* at 91:20–23.) Plaintiff recounted the ORB member responding, "You still have an accent, but you speak good English and I was wondering, like, did you learn it in the United States? You went to school in the United States, or somewhere else?" (*Id.* at 91:24–92:2.) Plaintiff answered, "I started to learn English when I was in Egypt." (*Id.* at 92:3–5.) Plaintiff also volunteered during this initial questioning, "I'm Egyptian but I was born a Christian," to further describe his background and his decision to pursue law enforcement later in life, even though no one asked Plaintiff about his religion and Major Barnett repeatedly told Plaintiff to stop talking about his religion. (*Id.* at 93:2–95:25; Doc. 19-6, pp. 22:18–25:5; Doc. 19-8, pp. 17:13–18:1.) According to Plaintiff, someone also asked him if he was a U.S. citizen. (Doc. 19-10, p. 97:4–15.)

During the interview, the ORB members also posed hypotheticals, and Plaintiff and the ORB members analyzed the resulting exchanges differently. For example, Major Barnett asked Plaintiff a question regarding a hypothetical traffic stop, and Plaintiff interrupted with a response. (*Id.* at 100:6–101:11.) Once the hypothetical was elaborated upon, Plaintiff recalled responding that he does not trust people when it comes to legal paperwork and stating, "it's not about trust. It's about clearing myself." (*Id.* at 107:6–109:16.) But both Majors Barnett and DeSantis interpreted this response as Plaintiff stating that he cannot trust anyone, with Major Barnett also noting that Plaintiff stated that he "does not believe he owes an explanation." (Doc. 19-9, p. 1; Doc. 19-15, p. 2; Doc. 19-10, p. 108:22–25; *see also* Doc. 19-6, p. 25:11–14.) Yet these interpretations run contrary to Plaintiff's insistence in his deposition that he never said "I don't trust people" or that he did not think he owed the ORB members an explanation. (Doc. 19-10, pp. 107:6–109:16.)

At another point during the interview, an ORB member asked Plaintiff if he had any weaknesses, and Plaintiff responded, "I don't have any weaknesses that will prevent me from doing my job proficiently." (Doc. 19-10, p. 102:11–20.) Although he was asked several more times, Plaintiff refused to change his answer, stating "I do not have any weaknesses that will prevent me from doing this particular job, according to the application and everything and the policy, proficiently." (*Id.* at 102:21–103:6, 106:17–107:1.) All three ORB members were put off by this response. (*See* Docs. 19-9, 19-15, 19-16; *see also* Doc. 19-6, p. 34:2–10.)

According to Plaintiff, Major DeSantis said that Plaintiff was a "good candidate," and Major Ring was happy throughout Plaintiff's interview and engaged in the

conversation. (Doc. 19-10, pp. 109:20–110:25.) However, Major Barnett's facial expressions throughout the interview indicated that he was displeased with Plaintiff's answers. (*Id.* at 109:17–19.)

### C.  The Three CIRs and Final Recommendation

In addition to asking questions, each ORB member completed a CIR. First and foremost, Major Barnett's CIR was negative. (Doc. 19-9.) Major Barnett failed Plaintiff in the categories of Oral Communication and Interpersonal/Leadership.[5] (*Id.* at 1.) Regarding Oral Communication, he wrote, "English 2nd Language? Some grammatical issues/errors. Tended to ramble during responses. Had some difficulty expressing ideas. Speaks several other languages." (*Id.*) For Interpersonal/Leadership, he wrote, "Advised that he doesn't trust anyone [and] does not believe he owes an explanation." (*Id.*) Major Barnett ultimately recommended failing Plaintiff and included the following statements in the Additional Comments/Reason for Recommendation section:

> Did have some difficulty understanding some questions
> Egyptian decent [sic]. Has desire to be in law enforcement [and] has had since a child, but father would not allow him to pursue.
> Wants to be a supervisor. Also interested in SWAT.
> Loyalty, respect [and] communication [are] core values.
> Communication will be a <u>major</u> issue if continued in process.
> Does not think he has <u>any</u> weaknesses! May have some cultural differences that may make it difficult for him to deal with professionally.

(*Id.* at 2.)

---

[5] Major Barnett also recommended failing Plaintiff in the Technical Knowledge (Experienced Candidate) category, but because Plaintiff was not experienced, this category had no bearing on the decision and thus is not discussed further in this Order. (*See* Doc. 19-9, p. 2; *see also* Doc. 19-6, pp. 12:17–13:1, 26:25–27:23; Doc. 19-8, pp. 12:20–23, 21:2–11.)

Later, when explaining these comments during his deposition, Major Barnett stated that during the interview Plaintiff was "struggling to express himself . . . [and] to verbally, orally communicate." (Doc. 19-6, p. 20:2–9.) He also discussed Plaintiff's failure to tell the ORB about his weaknesses, which is why he wrote that Plaintiff "does not believe he owes an explanation." (*Id.* at 21:12–22:15, 25:6–19, 34:2–10.) Major Barnett also "recall[ed Plaintiff] speaking about the lack of trust and not trusting people in general," which for him raised a red flag because the position of deputy sheriff requires trusting others. (*Id.* at 21:12–22:15, 25:6–19, 34:2–10.) Further, Major Barnett discussed Plaintiff's communication issues at length, stating:

> Typically, one of the most significant issues that I have with deciding to separate someone or retain them are communication issues, and that includes report writing, radio communications, and officer safety issues. . . . [A] large percentage of the people that I have to separate are for those reasons.
> Mr. Saweress, for example, had some difficulty understanding us. I could sense that I had some difficulty understanding him face-to-face. It's going to become amplified over the use of a police radio. And so I recognized that that alone is going to be a significant issue to get him through the field training and evaluation program.

(*Id.* at 31:10–31:23, 32:10–33:9.) According to Major Barnett, these issues stemmed not only from Plaintiff's "accent, dialect, whatever you'd like to call it" but also from Plaintiff's struggle to understand questions and express himself when responding. (*Id.* at 33:10–24.) Because of his numerous concerns, Major Barnett decided he was going to recommend failing him before Plaintiff even left the interview room. (*Id.* at 28:2–5.)

When questioned about his notation of Plaintiff's ethnicity, Major Barnett stated that it is not his practice to note an interviewee's country of origin, and he could not

explain why he wrote "Egyptian De[s]cent" in the comment section. (*Id.* at 28:22–29:10.)

Major Barnett also elaborated on his comment that Plaintiff "may have some cultural differences that may make it difficult for him to deal with professionally," tying this comment to the fact that Plaintiff "made it very clear that he didn't need our feedback" and that "he would not readily accept any feedback or critique that he may be provided"—despite the fact that the CIR is silent as to Plaintiff's inability to accept feedback. (*Id.* at 34:14–35:8.) The following line of questioning then ensued during the deposition:

> Q.    And you believe that was directly tied to his cultural differences?
>
> A.    I assumed, in fairness, that that may be a cultural issue. It may be an individual issue. I don't know. But in fairness, I did write that, and I thought it was perhaps a cultural issue.
>
> Q.    And what do you - - can you give me some examples of things you know about the Egyptian culture that would have led you to feel that way at the time?
>
> A.    I know nothing about the Egyptian culture.
>
> Q.    And when you say may make it difficult for him to deal with professionally, beyond what we just talked about in terms of accepting feedback, any other concerns that you had with his cultural differences that may have made him difficult to deal with professionally?
>
> A.    . . . . Beyond critique, there may be disciplinary issues that he could perhaps be the recipient of. We all, at some point or another, get spanked in our careers, at least I have once or twice. And so you have to be able to accept those spankings, if you will, and learn from them, and he was very defiant in his brief conversations with us.
>
> Q.    . . . . What I'm trying to understand is where do his cultural differences come into play vis-à-vis those spankings, as you talked about?

A.    I don't - - again, perhaps "cultural" is not the proper word. It could be just him as an individual. I don't know. That's just what hit me at the time and that's why I wrote it.

. . . .

**Q.    And is it equally fair to say that his Egyptian descent was at least a factor in your decision not to move him to the next step?**

A.    No. I don't think that's fair. I didn't really care. He could have been Chinese. I don't care. That really means nothing to me.

**Q.    All right. Well, then is it, alternatively, fair to say that his cultural differences were a factor in your decision not to hire him?**

A.    If that's, in fact, what they are, yes, sir. It could be a personal thing. Again, in fairness to you, that's what I wrote, and that was probably what I was assuming at the time.

(*Id.* at 35:9–37:7.)

Next up is Major DeSantis's CIR, which is partly consistent with Major Barnett's. (Doc. 19-15.) However, he recommended failing Plaintiff in the categories of Oral Communication and Decisiveness. (*Id.* at 1–2.) For Oral Communication, he wrote, "ESOL – English is 2nd language but was (not) understandable. Able to convey thoughts [and] ideas – rambled – had difficulty with answers." (*Id.* at 1.) For Decisiveness, he noted, "Responded quickly – did change some answers if faced w/ alternatives – generally stuck to answers but often changed his mind." (*Id.* at 2.) He too recommended failing Plaintiff, noting the following Additional Comments/Reason for Recommendation: "Weakness: Could not identify. Candidate will have several communication issues. Candidate could not identify one personal weakness. 'Stated he can't trust anybody.'" (*Id.*)

During Major DeSantis' deposition, he explained that Plaintiff's communication

started off fine, and "then the train went off the tracks." (Doc. 19-8, pp. 15:1–16:22.) He also remembered Plaintiff rambling and saying, without prompting, "something about his ethnicity of being Middle Eastern, but he was not a Muslim." (*Id.* at 17:2–18.) Major DeSantis noted that Plaintiff had good interpersonal skills but critiqued his communication skills, stating, "I think it was a general communication [issue]. And some of that had to deal with . . . his understanding of the questions that were being asked and what answers we were expecting from those questions." (*Id.* at 19:6–17.) Based on the communication issues and others noted in his CIR, Major DeSantis "was pretty set at the conclusion" of the interview that he would fail Plaintiff, yet he gave some deference to Major Barnett "simply because he is dealing with our selections on a day-in-and-day-out and he has a lot of hands-on experience with how successful candidates are going to be." (*Id.* at 22:10–11, 23:3–14.) That said, he explicitly stated that none of his concerns were due to Plaintiff's Egyptian descent, heritage, or any cultural differences. (*Id.* at 26:22–27:4.)

Last is Major Ring's CIR, which is significantly different from the other CIRs. (*See* Doc. 19-16.) He found Plaintiff on the border between pass and fail for Oral Communication and wrote, "Understandable communication. Speaks Arabic/Egyptian. Had a hard time understanding some of the questions." (*Id.* at 1; *see* Doc. 19-14, pp. 28:24–29:6.) For Interpersonal/Leadership, he passed Plaintiff, noting, "Was composed throughout the interview. Said he has no known weaknesses." (Doc. 19-16, p. 1.) And for Decisiveness, he wrote, "Was able to answer questions and use past experience to support them. Had to explain some questions to him to get a response." (*Id.* at 2; Doc. 19-14, p. 29:14–19.) Moreover, unlike the other two ORB members, Major Ring originally

recommended passing Plaintiff, although he ultimately failed him. (Doc. 19-16, p. 2.) In so doing, he stated, "Ok candidate" and "At times had a hard time understanding some of the questions and had to explain questions to him. Had issue with him saying he has no weaknesses." (*Id.*)

In explaining his CIR at his deposition, Major Ring discussed concerns with Plaintiff's communication but also stated that he has tried to correct similar difficulties with other deputy sheriffs through additional training or reassignment. (Doc. 19-14, p. 18:8–19, 18:24–19:1.) He also said that he did not think Plaintiff's communication was automatically disqualifying because it could potentially be worked on later and that his belief that he had no weaknesses, standing alone, would not warrant a failing recommendation. (*Id.* at 19:2–24, 20:19–21:6.) Yet Major Ring stated that he changed his recommendation from pass to fail based on the communication issues discussed by the others and Major Barnett's strong concerns as training major. (*Id.* at 16:16–18:7.)

Once Plaintiff left the interview room, the ORB members discussed Plaintiff's performance in an attempt to reach a consensus on whether he should continue in the hiring process. (Doc. 19-6, pp. 41:8–42:18.) According to Majors Barnett and DeSantis, they had already decided that they were going to fail Plaintiff due to concerns about his communication, his statement that he had no weaknesses, and his inability to trust others. (Doc. 19-6, pp. 28:2–8, 42:1–13; Doc. 19-8, pp. 21:16–22:1.) Major Ring, on the other hand, felt that Plaintiff should be continued until he heard the concerns raised by Majors Barnett and DeSantis, at which point he agreed that Plaintiff should not be continued. (Doc. 19-6, pp. 41:8–42:18; Doc. 19-14, pp. 16:16–17:18; Doc. 19-8, p. 22:11–17.) So all three ORB

members signed an Oral Review Board Consensus Sheet indicating a consensus as to the decision to discontinue Plaintiff in the hiring selection process. (Doc. 19-17; *see also* Doc. 19-6, p. 41:8–16.) Plaintiff was then notified via email on July 29, 2014 that the Sheriff's Office did not select him. (Doc. 19-12, p. 2.)

### D. The Instant Action

On August 17, 2017, after Plaintiff received a Dismissal and Notice of Rights regarding his Charge of Discrimination filed with the Equal Employment Opportunity Commission ("**EEOC**"), Plaintiff filed a five-count Complaint alleging race and national origin discrimination under 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964 ("**Title VII**"), and the Florida Civil Rights Act ("**FCRA**"). (Doc. 1, ¶¶ 22–57.) Now Plaintiff and Defendant both move for summary judgment, contesting whether Defendant's decision to discontinue Plaintiff in the hiring selection process for the deputy sheriff position was the result of discrimination because Plaintiff is an Egyptian-American. (Doc. 19, 22.) With briefing complete (*see* Docs. 27–29), the matter is ripe.

## II. LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)

(citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  ANALYSIS

Plaintiff makes one overarching claim against Defendant: the real reason he was not hired as a deputy sheriff is that the ORB members, and ultimately Defendant, discriminated against Plaintiff because he is an Egyptian-American. (*See* Doc. 1.) Defendant contests Plaintiff's claim of discrimination, seeking summary judgment on two grounds: (1) Plaintiff cannot establish a prima facie case of race and national origin discrimination; and (2) even if he could, Defendant's legitimate, nondiscriminatory reasons for not selecting Plaintiff for the deputy sheriff position were not pretextual. (Doc. 19, p. 1.) Plaintiff also moves for summary judgment on his claim, contending that he has direct evidence of discrimination. (*See* Doc. 22, pp. 7–10.) He also seeks summary judgment on Defendant's first affirmative defense. (*Id.* at 10–11.)

Under Title VII, employers must not "fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[6] So in employment discrimination cases the "sole concern is whether unlawful discriminatory animus motivate[d] a challenged employment

---

[6] Where, as here, a plaintiff seeks liability for employment discrimination under Title VII, § 1981, § 1983, and the FCRA, the Court need not address these claims separately because "the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985); *see also Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that these statutes "have the same requirements of proof and use the same analytical framework"); *Miller v. Fla. Hosp. Waterman*, No. 5:13-cv-249-Oc-10PRL, 2013 WL 5566063, at *2 n.1 (M.D. Fla. Oct. 8, 2013) ("The same analysis . . . applies to claims for employment discrimination brought under Title VII, 42 U.S.C. § 1981, and the FCRA.").

decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). A plaintiff can show employment discrimination by either direct or circumstantial evidence. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (citation omitted). Because Plaintiff insists direct evidence of discrimination exists and Defendant counters that not even circumstantial evidence of discrimination exists, the Court discusses each type of evidence in turn below.

### A. Direct Evidence of Discrimination

Plaintiff's Motion argues that direct evidence of discrimination exists. (Doc. 22, pp. 6–10.) "Direct evidence of discrimination is evidence, that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" *Schoenfeld*, 168 F.3d at 1266 (alterations in original) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate" qualify as direct evidence. *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989). Examples of such blatant remarks include: "women were simply not tough enough to do the job," *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930 (11th Cir. 1995); "Fire Earley—he is too old," *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); "if it was his company he wouldn't hire any black people" and "you [black] people can't do a–––thing right," *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990); and "he wasn't gonna let no Federal government make him hire no god-dam nigger," *Wilson v. City of Aliceville*, 779 F.2d 631, 634 (11th Cir. 1986). In contrast, "[e]vidence that only suggests discrimination or that is subject to more than one

interpretation does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations omitted). Rather, "it is by definition only circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (citing *Burrell*, 125 F.3d at 1393).

As direct evidence, Plaintiff first points to the final section of Major Barnett's CIR, in which he wrote "Egyptian De[s]cent" and "May have some cultural differences that may make it difficult for him to deal with professionally." (*See* Doc. 22, p. 8; Doc. 19-9, p. 2.) He also points to Major Barnett's deposition statement that Plaintiff's "cultural differences" were a factor in his decision to fail Plaintiff at the ORB interview stage. (Doc. 22, p. 8; *see also* Doc. 19-6, pp. 35:9–37:7.) Plaintiff contends that these statements are "blatant and prove[ ] discriminatory intent without inference or presumption" and that they are particularly troubling because Majors DeSantis and Ring deferred to the opinions of Major Barnett. (*See* Doc. 22, pp. 8–9.) Last, Plaintiff points to Major Barnett's examples of the "cultural differences" Plaintiff exhibited—defiance and an unwillingness to accept feedback—and that Major Barnett admitted to knowing nothing about Egyptian culture, arguing that this "is the precise type of racial stereotyping . . . anti-discrimination laws seek to protect against." (Doc. 22, p. 9; *see also* Doc. 19-6, pp. 35:9–37:7.)[7]

---

[7] Plaintiff also asserts that "[i]n addition to the 'cultural difference' admission by Major Barnett, he repeatedly criticized Plaintiff's 'communication.'" (Doc. 22, p. 9.) But although he states that "[a]ppellate courts have also acknowledged discriminatory perceptions about an individual's manner of speaking," (*id.* at 10 (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991); then citing *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008)), Plaintiff fails to cite to any specific comments by Major Barnett about his communication and does not argue how such comments constitute direct evidence of discrimination.

Further, "an employee's heavy accent or difficulty with spoken English can be a legitimate basis for adverse employment action where effective communication skills are

What is more, Plaintiff argues that the gravity of these discriminatory statements is even more apparent when compared to Major Barnett's treatment of a non-Egyptian, non-Middle Eastern candidate. (Doc. 22, p. 9–10.) Specifically, Plaintiff highlights Major Barnett's decision to pass Alfred Munoz even though Major Barnett criticized him for many of the same communication issues that supposedly caused Major Barnett to fail Plaintiff. (*Id.* at 9; *see also* Doc. 22-3, pp. 1–2 (stating that Mr. Munoz had a "heavy Hispanic dialect"; "tended to ramble at times when answering"; was "either confused or . . . easily changed mind when making some decisions"; and "at times did not exactly answer the questions directly [and] stated that he was not sure if he answered the question").) As a result, Plaintiff submits that "Major Barnett's unlawful animus motivated Defendant's decision to not hire Plaintiff" and that he "interjected his own racial biases, stereotypes and perceptions about Plaintiff into the hiring process." (Doc. 22, p. 10.)

Upon consideration of Major Barnett's statements, the Court finds that although they suggest discrimination and improper motives, they do not rise to the level of "the most blatant remarks" necessary to constitute direct evidence. *See Carter*, 870 F.2d at 582. For the CIR statements, the form indicates that the final section is for "Additional

---

reasonably related to job performance." *Fong v. Sch. Bd. of Palm Beach Cty., Fla.*, 590 F. App'x 930, 933 (11th Cir. 2014); *see also Stephen v. PGA Sheraton Resort, Ltd.*, 873 F.2d 276, 280–81 (11th Cir. 1989). This point is even made in one of the cases Plaintiff relies upon: "Unlawful discrimination does not occur . . . when a plaintiff's accent affects his ability to perform the job effectively." *Ang*, 932 F.2d at 548 (citing *Fragante v. City & Cty. of Honolulu*, 888 F.2d 591, 597 (9th Cir. 1989). Because Plaintiff has not argued that having an accent or any other communication issue would not affect his ability to perform as a deputy sheriff, this argument regarding Major Barnett's comments about Plaintiff's manner of communicating founders.

Comments/Reasons for Recommendation," (*see* Doc. 19-9, p. 2), so it is unclear whether any of those statements impacted his decision to fail Plaintiff. They may have all merely been additional comments. For the deposition statements, the questioning of Major Barnett to clarify his CIR statements creates further fog as to whether the intent of his remarks was discrimination. *See Carter*, 870 F.2d at 582. He repeatedly waffled between explaining his concerns about Plaintiff as "cultural differences" and as "an individual issue." (Doc. 19-6, pp. 35:9–37:7.) Major Barnett did explicitly state that if Plaintiff's inability to accept feedback and criticism and his defiance could be attributed to "cultural differences," which he "was probably . . . assuming at the time," then they did play a factor in his decision not to hire Plaintiff. (*Id*.) Yet he also walked this statement back, saying "perhaps 'cultural' is not the proper word" and that his concerns "could be a personal thing." (*Id*. at 36:10–11.) As it stands, these vacillating responses reveal that inference and presumption are the necessary glue to hold Major Barnett's statements together to form actual evidence of discrimination. *Cf. Schoenfeld*, 168 F.3d at 1267 (noting that direct evidence is that "from which discrimination can be found without the aid of an inference").[8]

---

[8] Further, Plaintiff's reliance on Major Barnett's comments about another candidate sheds no real light on the meaning of his statements about Plaintiff. While Major Barnett's concerns about Plaintiff's ability to communicate were similar to his concerns about Mr. Munoz, there are no comments on the CIR for Mr. Munoz that Major Barnett perceived him as having any difficulty accepting feedback, acting defiant, or exhibiting trust issues—all of which Major Barnett expressed concerns about with Plaintiff. (*Compare* Doc. 19-6, *and* Doc. 19-9, *with* Doc. 22-3.) To make any further leap from comparing Plaintiff's and Mr. Munoz's CIRs would require speculation and inference as to Major Barnett's decision-making, two things that would only belie the existence of direct evidence.

Although a reasonable jury could infer that Major Barnett's statements are evidence of a discriminatory motive behind his decision to fail Plaintiff, a reasonable jury could also infer that Major Barnett actually based his decision on legitimate concerns about Plaintiff's ability to perform the job of deputy sheriff, which he merely assumed could be connected to Plaintiff's culture. Because Major Barnett's statements are "subject to more than one interpretation," *see Merritt*, 120 F.3d at 1189, and "at best merely suggest[ ] a discriminatory motive, then [they are] by definition only circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266. Accordingly, the Court finds that Plaintiff has failed to clear the high hurdle of offering direct evidence of discrimination in the form of "the most blatant remarks." Instead, Plaintiff points only to circumstantial evidence, so his claim for summary judgment based on direct evidence falls flat and is denied.

B.     **Circumstantial Evidence of Discrimination**

Defendant's Motion argues that not only does Plaintiff lack direct evidence, he also does not have any circumstantial evidence of discrimination. (Doc. 19, pp. 11–22.) When circumstantial evidence is offered to prove discrimination, the Supreme Court has established a three-step, burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden "of establishing a prima facie case of racial discrimination." *Id.* at 802. Second, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Third, the burden shifts back to the plaintiff to "demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision" — a "pretext" for discrimination. *Id.* at 805.

But "[t]here is more than one way to show discriminatory intent using indirect or circumstantial evidence." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). While the *McDonnell Douglas* framework offers one way, it "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Another way is 'present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Hamilton*, 680 F.3d at 1320 (alteration in original) (quoting *Smith*, 644 F.3d at 1328). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Id.* (citing *Smith*, 644 F.3d at 1328). "[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith*, 644 F.3d at 1328. Therefore, the Court now takes each step of the *McDonnell Douglas* framework in stride and then briefly addresses this other way. Both lead to the same result.

### 1.    Step 1: Prima Facie Case of Discrimination

Defendant's Motion argues that Plaintiff cannot meet his initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. (Doc. 19, pp. 13–15); *see also McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case in a failure-to-hire case, a plaintiff must show that: "(1) he was a member of a protected class; (2) he applied and was qualified for a position for which the defendant was accepting applications; (3) despite his qualifications, he was not hired; and (4) after

his rejection the position remained open or was filled by a person outside his protected class." *Schoenfeld*, 168 F.3d at 1267 (citing *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir. 1987) (per curiam)). Here, Defendant concedes that Plaintiff can establish the first three elements (*see* Doc. 19, p. 14), so the key inquiry is whether Plaintiff can show either: (1) that the deputy sheriff position to which he applied remained open; or (2) that it was filled by a person outside his protected class. *See Schoenfeld*, 168 F.3d at 1267; *see also Walker v. Mortham*, 158 F.3d 1177, 1186 (11th Cir. 1998) (collecting cases with this as the fourth element).

The Court finds that Plaintiff has met his burden of establishing a prima facie case of discrimination under either alternative to proving the fourth element. Utilizing the second alternative, Plaintiff proffers the following to show that the deputy sheriff position was filled by a person outside his protected class:

> Plaintiff's ORB interview was conducted on July 25, 2014. The next applicant that Defendant can point to that was arguably in Plaintiff's protected class (Mr. Hafza, who is "Middle Eastern") was not hired until a year later in July 2015. Based on the records provided by Defendant, [another individual] was passed through the ORB on approximately August 1, 2014.

(Doc. 27, p. 13.) This statement is consistent with Defendant's evidence regarding hired Middle Eastern candidates. As the evidence reveals that the next hired Middle Eastern candidate was not hired until a year later—despite the uncontested assertion that other candidates passed through the ORB prior to that date[9]—Plaintiff has shown that if the

---

[9] Rather, Defendant asserts that "the fact that the Sheriff's Office hired individuals outside of Plaintiff's protected class during its continuous hiring process does not create a triable issue of fact." (Doc. 29, p. 3.)

position Plaintiff applied to was filled, it was filled by someone outside his protected class. *See Schoenfeld*, 168 F.3d at 1267.

Alternatively, the other way to satisfy the fourth element is to show that the position remained open, which Defendant admits. (*See* Doc. 19, p. 14.) Even so, Defendant asserts that "Plaintiff cannot establish the fourth element because . . . the Sheriff's Office hired other Middle Eastern applicants for the position of deputy sheriff before and after Plaintiff was rejected." (*Id.*) Relying on *Kennebrew v. Cobb County School District*, No. 1:15-cv-02495-RWS-CMS, 2017 WL 4334244 (N.D. Ga. May 22, 2017), Defendant requests that the Court view its hiring decisions collectively because the Sheriff's Office hires on an ongoing basis. (Doc. 19, p. 14.) From there, Defendant argues that "no reasonable jury could find that the Defendant would hire a Middle Eastern candidate in 2012, reject Plaintiff later in 2014 because he is Middle Eastern, then hire another Middle Eastern candidate in 2015." (*Id.*)[10]

---

[10] Defendant also asserts:

> Plaintiff cannot simply rely on the fact that the Sheriff's Office hired candidates of different national origins and races to establish a prima facie case because the Sheriff's Office was always hiring. The Sheriff's Office interviewed hundreds of employees in 2014 and hired dozens. Some of them were bound to be white, black, and Hispanic, and the fact that individuals of these races were hired has no probative value with respect to the fourth element of Plaintiff's prima facie case.

(*Id.* at 15.) Defendant then says that the fact that the Sheriff's Office hired "hired two (2) other candidates from the same protected class and employed six (6) others" constitutes "undisputed, conclusive evidence that candidates of other races were not selected in lieu of Plaintiff." (*Id.*) But the fourth element of a prima facie case in no way contemplates who was hired two years before or a year after, or who is currently employed by the defendant. *See Schoenfeld*, 168 F.3d at 1267. Moreover, in cases where the position was

This argument misses the mark for multiple reasons. For starters, in cases with no evidence that a defendant hired someone for the position to which a plaintiff applied, the fourth element is established by simply showing "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." *McDonnel Douglas*, 411 U.S. at 802. Defendant offers no evidence regarding any candidate who was hired for Plaintiff's coveted position, admits that "the position remained open," and, in the same breath, asserts that Plaintiff cannot prevail. (Doc. 19, p. 14.) Such assertions by Defendant clearly run contrary to the well-established law delineating the elements of a prima facie case in a failure-to-hire situation like Plaintiff's.

What is more, in requesting that the Court reach this divergent result, Defendant relies on a case with facts wholly inapposite here. Defendant is correct in stating that *Kennebrew* supports the proposition that where multiple individuals are hired for the same proposition, "summary judgment is warranted when at least some of the candidates hired were in plaintiff's same protected class." 2017 WL 4334244, at *8. But in *Kennebrew*, the African-American plaintiff applied for a position with five vacancies, three of which were filled shortly thereafter by African-American candidates. *Id.* at *1, *11. The case here in no way resembles that: Plaintiff, an Egyptian-American, unsuccessfully applied to a position in 2014, but Defendant hired a Middle Eastern candidate in 2012 and one in 2015. (Doc. 19, p. 15.) So applying *Kennebrew* would be a bridge too far—and the Court declines

---

filled, the fact that the Sheriff's Office hired individuals of other races certainly has probative value if those individuals were hired for the position to which Plaintiff applied.

Defendant's invitation to cross it.[11] Because Plaintiff has established a prima facie case of discrimination, Defendant's request for summary judgment on this basis is denied, and the burden shifts to him.

### 2.    Step 2: Legitimate, Nondiscriminatory Reason for Hiring Decision

"Once a plaintiff meets his burden of establishing a prima facie case, an inference of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its hiring decision." *Schoenfeld*, 168 F.3d at 1268–69 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). But "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Instead, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257. Moreover, "it is not the role of federal courts to second-guess the hiring decisions of business entities." *Schoenfeld*, 168 F.3d at 1260 (citing *Nix*, 738 F.2d at 1187).

According to Defendant, Plaintiff was not hired because he performed poorly at his ORB interview. (Doc. 19, p. 16.) Specifically, the ORB members determined that Plaintiff lacked the requisite communication and interpersonal skills. (*Id.*) Poor performance during an interview can satisfy the employer's burden of producing a legitimate, nondiscriminatory reason for not hiring an applicant. *See, e.g., Chapman v. AI*

---

[11] The same is true regarding the many other cases cited by Defendant to support his insistence that the Court should view Defendant's hiring decisions collectively: none is analogous to the situation at hand. (*See* Doc. 19, p. 14 n.4.)

*Transport*, 229 F.3d 1012, 1028 (11th Cir. 2000); *Samedi v. Miami-Dade Cty.*, 134 F. Supp. 2d 1320, 1346 (S.D. Fla. 2001). This poor performance can stem from a candidate exhibiting problems with communication, including a having heavy accent or difficulty speaking or understanding English, where, as here, "effective communication skills are reasonably related to job performance."[12] *Fong v. Sch. Bd. of Palm Beach Cty., Fla.*, 590 F. App'x 930, 933 (11th Cir. 2014).[13] Negative scores during an interview for interpersonal skills, as well as personality and judgment, can also establish a legitimate reason for an employment decision. *See McCarthney v. Griffin-Spaulding Cty. Bd. of Educ.*, 791 F.2d 1549, 1550–51 (11th Cir. 1986); *see also Samedi*, 134 F. Supp. 2d at 1346; *Mira v. Monroe Cty. Sch. Bd.*, 687 F. Supp. 1538, 1550–51 (S.D. Fla. 1988) (citing multiple cases finding employment decisions to be lawful when based on subjective evaluations of personality and judgment).

Therefore, Defendant's proffered reasons for failing to hire Plaintiff—poor communication and interpersonal skills displayed during his ORB interview—satisfy Defendant's burden of articulating a legitimate, nondiscriminatory basis for the decision. Notably, Plaintiff does not contest that Defendant has met its burden here. Because Defendant met its burden, "the initial inference of discrimination 'drops' from the case," *see Schoenfeld*, 168 F.3d at 1269 (citation omitted), and the ball is back in Plaintiff's court for the final step.

---

[12] Effective communication skills are reasonably related to performing the job of deputy sheriff, as indicated by the inclusion of communication skills in the job description and on the CIR evaluation forms. (*See* Doc. 19-2; *see also, e.g.*, 19-9, p. 1.)

[13] While unpublished opinions are not binding precedent, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*, 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

### 3.     Step 3: Pretext of Discrimination

Defendant's Motion also argues that Plaintiff cannot satisfy his burden for the third step in the *McDonnell Douglas* framework. (Doc. 19, pp. 18–22.) For this step, Plaintiff must "demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision"—a "pretext" for discrimination. *McDonnell Douglas*, 411 U.S. at 805. "A plaintiff may show pretext and survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons.'" *Schoenfeld*, 168 F.3d at 1269 (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)). Additionally, pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804–05)).

But it is not enough to "'merely question[ ] the wisdom of the employer's reason' as long as 'the reason is one that might motivate a reasonable employer.'" *Pennington v. City of Huntsvillle*, 261 F.3d 1262, 1267 (11th Cir. 2001) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)). Ultimately, the Court "must determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons [for the challenged employment decision] to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Conner v. Lafarge v. N. Am., Inc.*, 343 F. App'x

537, 541 (11th Cir. 2009) (alteration in original) (quoting *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008)) (internal quotation marks omitted).

Plaintiff offers a multitude of evidence to show that Defendant's proffered legitimate, nondiscriminatory reasons for not hiring Plaintiff—his communication issues, his insistence that he did not have any weaknesses, and his trust issues—are pretext for discrimination. (Doc. 27, pp. 15–18.) First, Plaintiff chips away at the credibility of these reasons by noting that he never said in his interview that he did not have any weaknesses or that he does not trust people. (*Id.* at 15.) Additionally, although Plaintiff's communication issues appear of utmost concern, Plaintiff highlights Major Barnett's decision to pass another candidate who had difficulty communicating and Major Ring's statement that he has worked with other previously hired deputy sheriffs with communication issues to help improve their communication skills. (*Id.* at 15–16.) Further, Plaintiff argues that the concerns about his communication—unlike legitimate concerns when a candidate understands very little English, *see Samedi*, 134 F. Supp. 2d at 1346— are more suspect here in light of Plaintiff's more proficient communication skills and the other "discriminatory remarks and circumstances surrounding the decision to not hire Plaintiff." (Doc. 27, p. 16.)

From this evidence, the Court finds that the multiple inconsistencies in ORB interview accounts and in Plaintiff's communication abilities (and the weight that must be afforded any difficulties) begin to drag Defendant's proffered reasons for not hiring

Plaintiff into question.[14] *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (noting that pretext is shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence" (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004))). And all of this, Plaintiff says, could cause "a reasonable jury [to] determine that the alleged communication concerns were related to Plaintiff's national origin or race." (Doc. 27, p. 16.) But is this enough to show pretext?

The strongest evidence Plaintiff proffers for showing pretext are the dubious comments made by Major Barnett that Plaintiff also offered as direct evidence of discrimination. (*See supra* Section III.A.) One way for a plaintiff to cast doubt upon a defendant's proffered legitimate, nondiscriminatory reasons is through discriminatory comments made by a decision maker. *See Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 872–73 (11th Cir. 2011). "Such remarks are evidence of pretext because they shed light on the decision maker's state of mind at the time that he made the challenged employment decision." *Id.* at 872. Relevant here, "[e]ven where such evidence of race bias proves

---

[14] Such inconsistences are magnified when comparing the CIRs and depositions of Major Barnett and Major Ring. Although Plaintiff's communication issues were pointed out repeatedly by Major Barnett, Major Ring's CIR reflects that although Plaintiff "[h]ad a hard time understanding some of the questions," he also exhibited "[u]nderstandable communication." (Doc. 19-16, p. 1) Major Ring also noted that Plaintiff "[w]as able to answer questions and use past experience to support them." (*Id.* at 2.) Moreover, in discussing Plaintiff's communication difficulties, Major Ring stated that he did not think the communication issues were of such severity that there was no chance that they could be dealt with after Plaintiff was hired. (Doc. 19-14, pp. 20:19–21:6.) So it seems that Major Ring did not find Plaintiff's ability to communicate nearly as concerning as Major Barnett.

insufficient to prove an employee's case through direct evidence, it can be relevant in the circumstantial framework to show that the employer's proffered reasons were pretextual." *Vessels*, 408 F.3d at 771 (citing *Ross v. Rhodes Furniture*, 146 F.3d 1286, 1291 (11th Cir. 1998)).

The most striking statements made by Major Barnett come from the comments in final section of Major Barnett's CIR and his explanations thereof. These include the fact that Plaintiff is of "Egyptian de[s]cent" and that Plaintiff "[m]ay have some cultural differences that may make it difficult for him to deal with professionally." (Doc. 27, p. 17; Doc. 19-9, p. 2.) Notably, Major Barnett stated in his deposition that perceived (at the time) cultural differences were a factor in his decision to fail Plaintiff[15]—although the differences may have actually just been "a personal thing" rather than cultural. (Doc. 27, p. 17; Doc. 19-6, pp. 35:9–37:7.) These perceived cultural differences include that Plaintiff was "very defiant," unwilling to accept feedback, and not a team player. (Doc. 19-6, pp. 34:14–35:8.) Yet Major Barnett's comments are most astounding due to the CIR's silence as to Plaintiff's defiance, unwillingness to accept feedback, and inability to work as a team player, as well as Major Barnett's confession, "I know nothing about the Egyptian

---

[15] Specifically, the question and answer were as follows:

**Q.    All right. Well, then is it, alternatively, fair to say that his cultural differences were a factor in your decision not to hire him?**

A.    If that's, in fact, what they are, yes, sir. It could be a personal thing. Again, in fairness to you, that's what I wrote, and that was probably what I was assuming at the time.

(Doc. 19-6, p. 37:1–7.)

culture." (*See* Doc. 19-9; *see also* Doc. 19-6, pp. 35:9–37:7.) Based on Major Barnett's CIR

comments and his cryptic explanations of them, there is a genuine dispute on this record

as to what weight, if any, Major Barnett (and the entire ORB, as other members deferred

to Major Barnett) gave to these "cultural differences" in concluding that Plaintiff should

not be hired. As a result, a reasonable factfinder could find that Defendant's legitimate,

nondiscriminatory reasons for not hiring Plaintiff were not what truly motivated the

decision to fail him during the ORB interview stage of the hiring selection process.

From Plaintiff's proffered evidence of pretext, particularly construed in the light

most favorable to Plaintiff, the Court finds that Plaintiff "has cast sufficient doubt on

[D]efendant's proffered nondiscriminatory reasons [for failing to hire Plaintiff] to permit

a reasonable factfinder to conclude that [Defendant's] proffered legitimate reasons were

not what actually motivated its conduct." *Conner*, 343 F. App'x at 541 (quoting *Crawford*,

529 F.3d at 976) (internal quotation marks omitted). In other words, Plaintiff has

"present[ed] evidence sufficient to demonstrate a genuine issue of material fact as to the

truth or falsity of [Defendant's] legitimate, nondiscriminatory reasons." *Schoenfeld*, 168

F.3d at 1269 (quoting *Evans*, 131 F.3d at 965). Therefore, Defendant's request for summary

judgment based on Plaintiff's inability to show pretext is denied.

### 4.      Inference of Intentional Discrimination

As mentioned above, an alternative route to survive summary judgment on an

employment discrimination claim exists—one that in this instance leads to the same

result. Assuming *arguendo* that Plaintiff had faltered along the three-step path of the

*McDonnell Douglas* framework, the evidence Plaintiff offered as direct and circumstantial

evidence of pretext—particularly Major Barnett's comments—construed in the light most favorable to Plaintiff clearly create "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker" for the same reasons discussed above. *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.2d 729, 734 (7th Cir. 2011)). So while it is true that a reasonable jury could find that Defendant based his decision on his proffered reasons, "the circumstantial evidence [also] raises a reasonable inference" that Defendant's real motivation was discriminatory. *Smith*, 644 F.3d at 1328. Therefore, summary judgment is improper as to Plaintiff's claims of discrimination. *See id.*

### C.    Defendant's First Affirmative Defense

Last, Plaintiff's Motion argues that he is entitled to summary judgment on Defendant's first affirmative defense. (Doc. 22, pp. 10–11.) Defendant's first affirmative defense is the following:

> As an Affirmative Defense to Counts I through VI, Defendant asserts that even if Plaintiff is able to prove that his race or national origin motivated Defendant's alleged employment action, which Defendant expressly denies, the same action would have been taken even absent such motivation, and therefore Plaintiff is not entitled to the relief request.

(Doc. 5, p. 5.) Plaintiff interprets this as "a mixed-motive defense" and relies on the elements of a mixed-motive claim to argue that because "there are no genuine issues of material fact regarding whether Plaintiff's race and/or national origin were a motivating factor in the hiring decision[,] . . . summary judgment in favor of Plaintiff is appropriate."

(Doc. 22, pp. 10–11.)[16]

But this argument fails because Defendant's first affirmative defense is a "same decision" affirmative defense, not a "mixed-motive" defense. The "same decision" defense "provides that if an employer can demonstrate it 'would have taken the same action in the absence of the impermissible motivating factor, the court . . . shall not award damages' or certain equitable relief." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1242 (11th Cir. 2016) (quoting 42 U.S.C. § 2000e-5(g)(2)(B)). And this defense is considered separately from a mixed-motive theory of discrimination. *See id.* at 1241–42.

Here, viewing the evidence in light most favorable to Defendant, the Court concludes that a reasonable jury could find that Plaintiff would not have been hired regardless of any "impermissible motivating factor." As discussed above, there is a genuine dispute of material fact as to whether Plaintiff's "cultural differences" impacted

---

[16] Relying on the Eleventh Circuit's decision in *Quigg v. Thomas County School District*, Plaintiff contends that "an employee, like Plaintiff, who is challenging a decision made by a board can succeed under a mixed-motive theory if he can demonstrate that 'discriminatory input,' such as [race or national origin bias], factored into the board's 'decisional process.'" (Doc. 22, p. 11 (alteration in original) (quoting *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1241 (11th Cir. 2016).) He then points to "Major Barnett's discriminatory input . . . [and] his stereotyped remarks" as evidence that Plaintiff's race, national origin, or both factored into the decision not to hire him.

To the extent Plaintiff is now asserting his own mixed-motive theory of discrimination rather than challenging Defendant's first affirmative defense, to prevail he must have "presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his race or national origin] was a motivating factor for [the] adverse employment decision." *Quigg*, 814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)). But as discussed throughout this Order, there is a genuine dispute of material fact as to whether Plaintiff's race, national origin, or "cultural differences" constituted a motivating factor in the decision not to hire him. So Plaintiff would not be entitled to summary judgment on a mixed-motive theory.

Major Barnett's decision not to hire Plaintiff or whether he relied only on legitimate, nondiscriminatory reasons. (*See supra* Subsections III.B.3–4.) Additionally, even if these cultural differences factored into Major Barnett's decision, it is unclear whether they played any role in the decisions of Majors DeSantis and Ring. For example, there is no evidence that Major DeSantis or Major Ring had independent discriminatory intent. Further, to the extent they deferred some to Major Barnett, Major DeSantis testified that he decided to fail Plaintiff prior to talking to Major Barnett, and Major Ring testified that he changed his mind based on the communication issues raised by Major Barnett. (*See* Doc. 19-8, pp. 22:10–11, 23:3–14, 26:22–27:4; Doc. 19-14, pp. 16:16–18:7.) It follows, then, that a jury could find that all three (or at least two) ORB members would have voted to fail Plaintiff, resulting in the discontinuance of Plaintiff in the hiring selection process, regardless of any discriminatory motivations.[17] So Plaintiff's request for summary judgment on Defendant's first affirmative defense is denied.

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Wayne Ivey's Case Dispositive Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 19) is **DENIED.**

2. Plaintiff Romel Saweress' Dispositive Motion for Summary Judgment (Doc. 22) is **DENIED.**

---

[17] Although all three ORB members try to reach a consensus as to whether a candidate should continue to the next step of the hiring selection process, a consensus is not required. (Doc. 19-6, pp. 10:1–13, 41:8–16; Doc. 19-14, pp. 21:16–22:4.)

3.      This matter will proceed to trial on all Counts.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 1, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record